RICHMOND STATE HOSPITAL and All Other Similarly Situated State Institutions and Agencies, Appellants–Defendants,

v.

Paula BRATTAIN,[1] Francis Ernst, Rebecca Strong, Terry Sutcliffe, Individually, Collectively, and on Behalf of All Others Similarly Situated, Appellees–Plaintiffs.

No. 49A02–0908–CV–718.

Court of Appeals of Indiana.

Oct. 8, 2010.

Rehearing Denied Dec. 27, 2010.

---

1. Paula Brattain is now deceased and has been replaced as class representative by Jennie Veregge.

Gregory F. Zoeller, Attorney General of Indiana, David L. Steiner, Frances Barrow, Donald G. Banta, Patricia Orloff Erdmann, Laura L. Bowker, Deputy Attorneys General, Indianapolis, IN, Attorneys for Appellants.

William A. Hasbrook, John F. Kautzman, Ruckelshaus Kautzman, Blackwell Bemis & Hasbrook, Indianapolis, IN, Stephen D. Susman, Jonathan Bridges, Stephen Shackelford, Jr., Susman Godfrey LLP, Dallas, TX, Attorneys for Appellees.

## OPINION

CRONE, Judge.

### Case Summary and Issues[2]

From 1967 until 1993, the State of Indiana required some of its employees to work 40 hours per week while other employees in the same job classification were required to work only 37.5 hours per week for the same salary. The job classifications in which this occurred were referred to as "split classifications." Thus, the 40–hour–per–week employees in split classifications effectively received a lower hourly wage than their counterparts working 37.5 hours per week.

Employees who had been required to work 40 hours per week filed a class action lawsuit against Richmond State Hospital and all other similarly situated State Institutions and Agencies (collectively referred to as "the State") alleging that their salaries were required to be, but were not, equal to that paid to their counterparts working 37.5 hours per week. The trial court certified the class action and created four sub-classes: (1) merit/overtime-eligi-

---

2. We held oral argument on August 23, 2010 in Indianapolis. We commend counsel on the quality of their advocacy.

ble; (2) merit/overtime-exempt; (3) non-merit/overtime-eligible; and (4) non-merit/overtime-exempt (collectively referred to as "the Employees").[3] The trial court found that the State had a contractual duty to provide its employees with equal pay for comparable work, that it had breached that duty by failing to pay the 40–hour–per–week employees the same effective hourly wage as that paid to their counterparts who worked only 37.5 hours per week, entered judgment in favor of the Employees, and awarded them back pay in the amount of $42,422,788.

The State appeals the trial court's judgment. In considering the State's appeal, we address the following issues: (1) whether the trial court erred in finding that the merit Employees were not required to exhaust any available administrative remedies because to do so would have been futile; (2) whether the trial court abused its discretion in certifying a plaintiff class; (3) whether the trial court clearly erred in finding that the merit Employees were entitled to damages for the State's alleged breach of the "equal pay for comparable work" provision of the State Personnel Act; (4) whether the trial court clearly erred in finding that the nonmerit Employees were entitled to damages for the State's alleged breach of contract; (5) whether the trial court clearly erred in finding that the merit Employees were entitled to receive twenty years of back pay; (6) whether the trial court clearly erred in determining which job classifications were split; (7) whether the trial court abused its discretion in admitting Plaintiffs' Exhibit C; (8) whether the trial court erred in relying on the damages estimates prepared by the Employees' damages expert; and (9) whether the Employees'

claims are barred under the equitable doctrine of laches.

We reach the following resolutions of the issues: (1) the trial court did not err in finding that the merit Employees were excused from exhausting administrative remedies because to do so would have been futile; (2) all the statutory requirements for class action certification were satisfied, and thus the trial court did not abuse its discretion in certifying a plaintiff class; (3) the merit Employees are entitled to damages for the State's breach of the "equal pay for comparable work" provision of the State Personnel Act; (4) the non-merit Employees are entitled to back pay for the State's breach of the Equal Privileges and Immunities Clause of the Indiana Constitution; (5) the trial court erred in finding that the merit Employees were entitled to receive twenty years of back pay; (6) the trial court committed no error in determining which Employees were in split classifications; (7) the trial court did not abuse its discretion in admitting Plaintiffs' Exhibit C; (8) the trial court did not err in relying on damages estimates prepared by plaintiffs' damages expert; and (9) the State failed to establish all the elements of laches, and therefore it does not bar Employees' claims. We affirm in part, reverse in part, and remand with instructions to recalculate the amount of back pay to which the merit Employees are entitled.

### Facts and Procedural History

The Employees were or are employed by the State. There are different categories of state employees, which are governed by different statutes and regulations. There are merit employees, who work at the merit agencies listed in Indiana Code Section 4–15–2–3.8,[4] and

---

3. The sub-class representatives are Jennie Veregge (who replaced Paula Brattain), Fran- cis Ernst, Rebecca Strong, and Terry Sutcliffe.

4. The merit agencies are

nonmerit employees. The merit and non-merit employees can be further divided into those who are eligible for overtime pay under federal labor laws and those who are not. Thus, there are four categories of Employees involved in this class action suit: (1) merit/overtime-eligible; (2) merit/overtime-exempt; (3) non-merit/overtime-eligible; and (4) non-merit/overtime-exempt.

### History of State Rules Governing Work Hours

In 1953, the Indiana General Assembly passed Indiana Code Section 4–1–2–1 requiring state employees working in "state offices" to work 37.5 hours per week. Indiana Code Section 4–1–2–1 provides in relevant part:

It is the intent of this chapter that state offices be open and able to conduct public business at all times during an eight and one-half (8½) hour working day. Each employee shall work for a full seven and one-half (7½) hours each working day and provision for a one (1) hour lunch period shall be provided each employee.

In 1967, the State Personnel Board[5] determined that state employees who worked in "state institutions," as opposed to state offices, would work 40 hours per week. *See* 31 Ind. Admin. Code 2–11–1 (1988) (requiring merit employees to work 40 hours per week); 31 Ind. Admin. Code 1–9–1 (requiring nonmerit employees to work 40 hours per week) (1988).[6] In 1987, the State Personnel Department ("SPD")[7] learned that nine state institutions were not in compliance with the 40–hour work

the county offices of family and children[,] the division of disability and rehabilitative services, division of aging, Fort Wayne State Developmental Center, division of mental health and addiction, Larue D. Carter Memorial Hospital, Evansville State Psychiatric Treatment Center for Children, Evansville State Hospital, Logansport State Hospital, Madison State Hospital, Richmond State Hospital, state department of health, Indiana School for the Blind and Visually Impaired, Indiana School for the Deaf, Indiana Veterans' Home, Indiana Soldiers' and Sailors' Children's Home, Silvercrest Children's Development Center, department of correction, Westville Correctional Facility, Plainfield Juvenile Correctional Facility, Putnamville Correctional Facility, Indianapolis Juvenile Correctional Facility, Indiana State Prison, Indiana Women's Prison, Pendleton Correctional Facility, Reception and Diagnostic Center, Rockville Correctional Facility, Youth Rehabilitation Facility, Plainfield Correctional Facility, department of homeland security (excluding a county emergency management organization and any other local emergency management organization created under IC 10–14–3), civil rights commission, criminal justice planning agency, department of workforce development,

Indiana historical bureau, Indiana state library, division of family resources, department of child services, Indiana state board of animal health, Federal Surplus Property Warehouse, Indiana education employment relations board, department of labor, Indiana protection and advocacy services commission, commission on public records, Indiana horse racing commission, and state personnel department.
Ind.Code § 4–15–2–3.8.

**5.** The State Personnel Board "shall advise the [State personnel] director and cooperate in the improvement of all the personnel policies of the state." Ind.Code § 4–15–1.8–7(c).

**6.** The rules have been amended and currently require state employees to work 37.5 hours per week.

**7.** The State Personnel Department is required to perform such duties as develop personnel policies, allocate job positions to their proper classifications, establish classification plans and salary and wage schedules, approve employees for transfer, demotion and promotion, rate employees' service, promulgate and enforce personnel rules, and maintain personnel records and a roster of the personnel of all state agencies. Ind.Code § 4–15–1.8–7(a).

week requirement.[8] The SPD issued a memorandum ("the 1987 Memorandum") to all state agencies and institutions, which stated in pertinent part as follows:

Persons employed full time in state institutions are to work a minimum of 40 hours per week in accordance with 31 I.A.C. 1–9–1 and 31 I.A.C. 2–11–1.

Persons employed full time in state offices are to work a minimum of 37–½ hours per week, with an hour off each day for lunch, in accordance with IC 4–1–2–1. The phrase "state offices" is interpreted as those places where the general public may conduct business with the various departments and agencies of their state government. Appellants' Br. at 67. Thus, certain job classifications had some employees who worked 40 hours per week in state institutions and others who worked 37.5 hours a week in state offices, creating a system wherein such job classifications were known as "split classes." The state institutions that were out of compliance with the 40–hour work week rule came into compliance in the beginning of 1988, with the exception of correctional facilities, which returned to compliance in early 1990.

### Arden & Coulter v. State Employees' Appeals Commission

On September 19, 1993, in response to an important Indiana Court of Appeals opinion, *Arden & Coulter v. State Employees' Appeals Commission*, 578 N.E.2d 769 (Ind.Ct.App.1991), the SPD abolished the split class system and issued a policy standardizing the computation of hourly rates for all state employees on the basis of a 37.5–hour work week. To understand the facts and procedural history of this case, familiarity with the *Arden* decision is essential. *Arden* involved only two categories of state employees, merit/overtime-eligible and merit/overtime-exempt, rather than the four categories present in this litigation. However, *Arden* was not a class action lawsuit. In *Arden*, employees who had been working 37.5 hours per week at state institutions objected to the 40–hour work week requirement that was implemented pursuant to the 1987 Memorandum and "timely pursued all administrative remedies," but the State Employees' Appeals Commission ("SEAC") denied relief.[9] *Id.* at 770. The employees sought judicial review of the SEAC's decision. The trial court affirmed the SEAC, and both groups of employees appealed.

On appeal, the *Arden* court addressed two separate issues. With regard to the merit/overtime-*eligible* employees, the issue on appeal was whether it was proper for the State to require merit/overtime-eligible employees in a given classification to work 40 hours per week for the same salary as that received by other employees in the same classification who worked only 37.5 hours per week. To answer the question, the *Arden* court relied on 31 Indiana Administrative Code 2–4–2, which provided that "[a]ll regulations ... shall be designed ... to guarantee ... *equal pay for comparable work* in the several agencies of the state service." (Emphasis added.) We concluded that the merit/overtime-eligible employees in a given classification working in state institutions and those of

---

8. These institutions were the Fort Wayne State Developmental Center, the Central State Hospital, the Larue Carter Hospital, the Richmond State Hospital, the Boys' School, the Girls' School, the Veterans' Home, the School for the Deaf, and the School for the Blind.

Appellants' App. Vol. 4 at 631 ("Joint Pre-trial Stipulation").

9. The SEAC consists of five members who hear and investigate appeals from state merit employees as set forth in Indiana Code Section 4–15–2. Ind.Code §§ 4–15–1.5–1 and –6.

the same classification working in state offices were doing comparable work. *Id.* at 772. As to equal pay, we rejected the State's argument that as long as the bi-weekly salaries were the same, it was irrelevant how many hours the employees were required to work.[10] We concluded that the "trial court erred in determining that the disparity in pay between [the state institutional employees] and their state office counterparts was proper." *Id.* at 773. This conclusion was the impetus for the State to abolish the split class system.

The issue for the merit/overtime-*exempt* employees was different. In their case, there were no state office employees performing comparable work for 37.5 hours per week. Thus, we did not need to reach the question of equal pay. The question then was "whether the State could increase the hours of employment from 37.5 to 40." *Id.* We noted that the merit/overtime-exempt employees had "not directed us to any regulatory, statutory, or constitutional principle or authority in support of their argument that the State, under present law, could not increase their hours[,]" and we had found none. *Id.* Therefore, we concluded that the trial court properly determined that the merit/overtime-exempt employees were not entitled to relief. *Id.* at 774.

### Initiation of This Lawsuit

After *Arden* was decided in September 1991, but before the State eliminated the pay disparity between employees in state offices and institutions in September 1993, this lawsuit was initiated on July 29, 1993,

on behalf of *merit* Employees, both overtime-eligible and overtime-exempt. The brief complaint simply alleged that the plaintiffs were state employees working 40 hours per week for the same salary as their counterparts in state offices who worked 37.5 hours per week and that "[u]nder Indiana law, like-classified institutional workers are entitled to receive the same pay for comparable work as State office employees." Appellants' App. Vol. 1 at 67. The complaint further stated that the plaintiffs had not filed grievances with the SEAC.

On September 27, 1993, the State filed a motion to dismiss, arguing that the plaintiffs, who were all merit Employees, had failed to exhaust their administrative remedies pursuant to the Administrative Orders and Procedures Act ("AOPA"). *Id.* at 74–79. The trial court denied the motion because it found that a factual determination was needed as to whether any exceptions to the doctrine of exhaustion of administrative remedies existed. *Id.* at 117–19.

On December 9, 1997, the State filed a motion for summary judgment, arguing that the merit Employees had failed to exhaust their administrative remedies and that Strong and other overtime-exempt employees were not entitled to relief under *Arden.* *Id.* at 129–33. The merit Employees opposed the State's motion, and the trial court granted them leave to seek summary judgment pursuant to Indiana Trial Rule 56(B).[11] On August 28, 1998, the trial court denied the State's motion and granted summary judgment in favor of

10. In fact, we characterized the State's argument as "a display of frighteningly flawless Orwellian logic." *Arden,* 578 N.E.2d at 772. "Taken to its extreme, the State's argument would lead to an absurd conclusion that the Employees could be compelled to work 24 hours per day, seven days per week, (a total of 168 hours) for the same salary like-classified

state office employees receive for only 37.5 hours of week." *Id.*

11. Indiana Trial Rule 56(B) provides that a "party against whom a claim ... is sought may, at any time, move with or without supporting affidavits for a summary judgment in his favor as to all or any part thereof."

the merit Employees.[12] The August 1998 ruling provided in pertinent part as follows:

(a) although, in most cases, a party must exhaust administrative remedies before seeking relief from the courts, in certain circumstances, the failure to exhaust administrative remedies does not preclude a claim;

(b) those circumstances include situations where compliance with the rules of exhaustion would be futile . . . ;

. . .

(d) prior to the judicial relief granted in *Arden & Coulter v. SEAC*, all claims involving the change of work hours were denied;

(e) since there was no relief available from either SEAC or the [SPD] it would have been futile for the Plaintiffs and all others similarly situated to exhaust administrative remedies;

. . .

(h) as a matter of law, the Plaintiffs in this case and all others similarly situated were not required to exhaust administrative remedies because to do so would have been futile;

. . .

(j) the Plaintiffs were not bound by any administrative time limitations because administrative relief was futile;

. . .

(r) the claims of certain of the Plaintiffs are not precluded as a matter of law

simply because they are overtime exempt employees.

Appellants' Br. at 59–60.

On July 27, 2001, the Employees filed a praecipe for hearing on damages and class certification.

On February 6, 2002, the State filed a motion to reconsider the August 1998 summary judgment ruling, which was denied.[13]

### Sub–Class Representatives

On February, 8, 2002, the Employees filed an amended complaint adding non-merit employees and naming the class representatives to represent the four subclasses of plaintiffs. On February 28, 2003, the trial court issued an order granting class certification. The salient facts regarding the class representatives follow. Veregge worked at Richmond State Hospital from 1987 to at least September 19, 1993, as a "Clerk Typist V." *Id.* at 68. Richmond State Hospital was classified as a merit agency, and the "Clerk Typist V" position was classified as an overtime-eligible position for purposes of federal labor laws. *Id.* at 69. Thus, Veregge was a merit /overtime-eligible employee and represents that sub-class of plaintiffs in this litigation. When Veregge was hired, she was required to work 37.5 hours per week. However, Richmond State Hospital was one of the state institutions not in compliance with the 40–hour work week requirement. Following the issuance of the 1987 Memorandum, Veregge's hours were increased to 40 hours per week in February 1988.

---

**12.** The litigation then took various twists and turns not relevant to this appeal, including an interlocutory appeal of the August 1998 summary judgment ruling and a memorandum decision rendered by this Court. *See Brattain v. Richmond State Hosp.*, No. 49A02–0006–CV–387, 742 N.E.2d 1039 (Ind.Ct.App. Feb. 21, 2001); Appellants' App. Vol. 2 at 467. Ultimately, the August 1998 ruling was reinstated on February 21, 2001, and incorporated into the final judgment.

**13.** Following denial of its motion to reconsider, the State filed a petition for interlocutory appeal. The trial court certified the August 1998 ruling to allow immediate appeal, but this Court declined to accept jurisdiction over the appeal.

Strong began working for the State in 1971 and worked at Richmond State Hospital from 1973 to at least September 19, 1993, as a "Social Worker IV," which is an overtime-exempt position. *Id.* Strong represents the merit/overtime-exempt employees. When Strong was hired, she was required to work 37.5 hours per week, which was increased to 40 hours in February 1988.

Ernst worked for the Indiana Department of Transportation (then the State Highway Commission) from 1969 until at least September 19, 1993. *Id.* The Indiana Department of Transportation was not classified as a merit agency. From 1989 through 1993, Ernst was classified as an "Engineering Assistant Supervisor III," which was an overtime-eligible position for purposes of federal labor laws. *Id.* at 70. Ernst was a nonmerit/overtime-eligible employee and represents that sub-class of plaintiffs in this litigation. From 1989 through 1993, Ernst was required by the State to work 40 hours per week.

Sutcliffe worked for the Indiana Department of Transportation from 1969 until at least September 19, 1993, as a "Highway Engineer," which was an overtime-exempt position for purposes of federal labor laws.[14] *Id.* Sutcliffe represents the nonmerit/overtime-exempt employees in this litigation. When he was first hired, Sutcliffe was required to work 37.5 hours a week, but in August 1973, that changed to 40 hours a week.

On April 20, 2008, the State filed a second motion for summary judgment, asserting in pertinent part that (1) there was no private right of action for damages under either the State Personnel Act or the Indiana Constitution; (2) the "equal pay for comparable work" provision in 31

Indiana Administrative Code 2–4–2 did not apply to nonmerit employees; and (3) pursuant to *Arden*, no overtime-exempt employees were entitled to additional pay. Appellants' App. Vol. 3 at 556–71. On July 14, 2008, the trial court issued an order summarily denying the State's motion. *Id.* at 627.

### Final Judgment

Following a bench trial, on July 28, 2009, the trial court entered findings of fact, conclusions thereon, and judgment ("the Final Judgment"), which provides in relevant part as follows:

(9) All actions based upon written contracts other than those for the payment of money entered before 1982 must be commenced within twenty (20) years after the cause of action has accrued [.]

. . .

(11) Because Plaintiffs Veregge, Strong, Ernst and Sutcliffe, and all others similarly situated, entered into performance of their duties as State employees from the time they were first hired by the State, they are deemed as a matter of law to have written employment contracts with the State that incorporate all relevant statutes and regulations in addition to all other laws applicable to their positions.

. . .

(13) Requiring State "merit" employees to work 40 hours per week for the same pay as other State employees in the same job classification whom the State required to work only 37.5 hours per week violates the Indiana "equal pay for comparable work" regulation that

---

14. Sutcliffe was classified as a "Highway Engineer I" in May 1973, reclassified as a "Highway Engineer IV" sometime in 1976, and reclassified again as "Highway Engineer III" sometime in 1978.

was in force during the Class Period, 31 I.A.C. § 2–4–2.

(14) That regulation is incorporated into the employment contract of every State employee working for a State "merit agency[.]" Any violation of that regulation accordingly constitutes a breach of the State's employment contract with the State employee.

(15) By requiring Plaintiffs and others similarly situated, to work 40 hours per week in "split classes" during the Class Period, the State violated the "equal pay for comparable work" regulation and accordingly breached its employment contracts with Plaintiffs and with any other persons similarly situated.

. . .

(18) The State's above-described breaches of its employment contracts with Plaintiffs and other similarly situated persons caused them monetary damages.

. . .

(21) In this case, the State's monetary liability can be demonstrated by a mathematical computation upon which the parties basically agree; the base pay an employee received from the State for the time during which he or she was working 40 hours per week in a "split class," multiplied by 6.67%. Given this, and given the records Plaintiffs' expert David N. Fuller utilized to calculate aggregate damages—including the State's own employment and payroll records—aggregate proof of class damages is proper in this case.

Appellants' Br. at 78–81 (citations omitted). The trial court entered judgment in favor of the Employees and ordered the State to pay the Employees $42,422,788, which is composed of $20,979,490 for merit/overtime-eligible employees; $2,696,812 for merit/overtime-exempt employees;

$16,762,773 for non-merit/overtime-eligible employees; and $1,983,713 for non-merit/overtime-exempt employees. *Id.* at 81–82. The State appeals. Additional facts will be provided when necessary.

### Discussion

#### *Standard of Review*

Generally, the following standard of review applies to the issues raised. Any departure will be indicated. When reviewing claims tried without a jury, we will not set aside the findings and judgment unless they are clearly erroneous. Ind. Trial Rule 52(A). "Findings of fact are clearly erroneous when the record lacks any evidence or reasonable inferences from the evidence to support them." *St. John Town Bd. v. Lambert*, 725 N.E.2d 507, 518 (Ind.Ct.App.2000). "A judgment is clearly erroneous when it is unsupported by the findings of fact." *Id.* We will reverse the judgment only when the record leaves us firmly convinced that a mistake has been made. *S.C. Nestel, Inc. v. Future Constr., Inc.*, 836 N.E.2d 445, 449 (Ind.Ct.App. 2005). "We neither reweigh the evidence nor assess the credibility of witnesses, but consider only the evidence most favorable to the judgment." *Id.*

#### I. *Exhaustion of Administrative Remedies*

Although the State first raised the exhaustion of administrative remedies in its motion to dismiss, the trial court ultimately issued a summary judgment ruling against the State and in favor of the merit Employees, which the State appeals. Our standard of review is well settled.

Upon reviewing the grant or denial of summary judgment, we use the same standard of review as the trial court. Summary judgment is appropriate only where the evidence shows that there is no genuine issue of material fact and the

moving party is entitled to judgment as a matter of law. We will construe all facts and reasonable inferences in favor of the non-moving party. The review of a summary judgment motion is limited to those materials designated to the trial court.

*Id.* (citations omitted).[15] The trial court's findings and conclusions facilitate our review, but we are not bound by them and may sustain the summary judgment on any theory or basis in the record. *Ledbetter v. Ball Mem'l Hosp.*, 724 N.E.2d 1113, 1116 (Ind.Ct.App.2000), *trans. denied.*

The State argues that the *merit* Employees, both overtime-eligible and overtime-exempt, failed to exhaust the administrative remedies provided by the State Personnel Act ("SPA") (Indiana Code Chapter 4–15–2) and the AOPA (Indiana Code Title 4, Article 21.5) and that the trial court erred in finding that pursuit of those remedies would have been futile.

The AOPA "establishes the exclusive means for judicial review of an agency action." Ind.Code § 4–21.5–5–1. An aggrieved person may seek judicial review "only after exhausting all administrative remedies available within the agency whose action is being challenged and within any other agency authorized to exercise administrative review." Ind.Code § 4–21.5–5–4. Generally, if an administrative remedy is available, the claimant must pursue it before access to the courts is granted. *Johnson v. Patriotic Fireworks, Inc.*, 871 N.E.2d 989, 992 (Ind.Ct.App. 2007). However, a party is not required to exhaust available administrative remedies "when the remedy is inadequate or would be futile, or when some equitable consideration precludes application of the rule." *Ind. Mich. Power Co. v. Runge*, 717 N.E.2d 216, 226 (Ind.Ct.App.1999).

### A. Burden of Proof

As an initial matter, the parties dispute who bore the burden of proof. The State's position is that exhaustion of administrative remedies is an issue of subject matter jurisdiction, for which the merit Employees had the burden of proof. *See Ind. Dep't of Envtl. Mgmt. v. NJK Farms, Inc.*, 921 N.E.2d 834, 842 (Ind.Ct.App.2010) ("The failure to exhaust administrative remedies deprives the trial court of subject matter jurisdiction."), *trans. denied.* The merit Employees argue that failure to exhaust administrative remedies is an affirmative defense, for which the State had the burden to prove that (1) the merit Employees failed to exhaust their administrative remedies and (2) the administrative remedies would not have been futile.[16]

---

**15.** We observe that the exhaustion of administrative remedies calls into question the trial court's subject matter jurisdiction. *Ind. Dep't of Envtl. Mgmt. v. NJK Farms, Inc.*, 921 N.E.2d 834, 842 (Ind.Ct.App.2010). Some case law suggests that the trial court should have decided this matter in its ruling on the State's motion to dismiss and that it was improper to use summary judgment. *See Perry v. Stitzer Buick GMC, Inc.*, 637 N.E.2d 1282, 1286 (Ind.1994) (discussing differences between summary judgment and motion to dismiss for lack of subject matter jurisdiction: "Summary judgment terminates litigation predicated upon a finding that there are no material issues of fact that necessitate trial.... By contrast, a motion to dismiss for lack of subject matter jurisdiction presents a threshold question concerning the court's power to act."); *see also Brazauskas v. Fort Wayne–South Bend Diocese, Inc.*, 714 N.E.2d 253, 259 (Ind.Ct.App.1999) ("[A]n attack on the court's subject-matter jurisdiction cannot form the basis of a motion for summary judgment."), *trans. denied.*

**16.** Note that this dispute is *not* one regarding the distinction between a claim of lack of subject matter jurisdiction, which cannot be waived, from a claim of procedural error (referred to in the past as "jurisdiction over the particular case"), which can be waived. *See Packard v. Shoopman*, 852 N.E.2d 927, 929–30 (Ind.2006) (stating that statutory "jurisdic-

While we agree with the merit Employees that the State had the burden to prove that they failed to exhaust their administrative remedies, we conclude that the merit Employees bore the burden to prove that their administrative remedies would have been futile.

■ Indiana Trial Rule 8(C) provides, "A responsive pleading shall set forth affirmatively and carry the burden of proving: ... lack of jurisdiction over the subject-matter[.] A party required to affirmatively plead any matters, including matters formerly required to be pleaded affirmatively by reply, shall have the burden of proving such matters." Lack of subject matter jurisdiction is an affirmative defense which may be raised either in the answer to the complaint or in a motion to dismiss under Trial Rule 12(B)(1).[17] *GKN Co. v. Magness,* 744 N.E.2d 397, 403–04 (Ind.2001); *Perry v. Stitzer Buick GMC, Inc.,* 637 N.E.2d 1282, 1286 (Ind.1994). "[T]he party challenging a trial court's subject matter jurisdiction bears the burden of proving that jurisdiction does not exist." *Indianapolis–Marion County Pub. Library v. Shook, LLC,* 835 N.E.2d 533, 539 (Ind.Ct.App.2005) (citing *Methodist Hosp. of Ind., Inc. v. Ray,* 551 N.E.2d 463, 467 (Ind.Ct.App.1990), *adopted in* 558 N.E.2d 829 (Ind.1990)). Thus, the State bore the burden to prove that the merit Employees failed to exhaust their administrative remedies. The State's burden was satisfied because the merit Employees

conceded that they had not exhausted their administrative remedies. *See* Appellants' App. Vol. 1 at 117–18 ("Findings of Fact and Conclusions of Law" on the State's motion to dismiss) ("The plaintiffs concede that they filed no grievance with the [SEAC] because exhaustion would be both inadequate and futile.").

■ As to the burden of establishing futility of administrative remedies, we observe that to prevail on a claim of futility, *the petitioner* " 'must show that the administrative agency was powerless to effect a remedy or that it would have been impossible or fruitless and of no value under the circumstances.' " *Johnson v. Celebration Fireworks, Inc.,* 829 N.E.2d 979, 984 (Ind. 2005) (quoting *M–Plan, Inc. v. Ind. Comprehensive Health Ins. Ass'n,* 809 N.E.2d 834, 840 (Ind.2004)). Accordingly, the merit Employees had the burden to prove that exhaustion of administrative remedies would have been futile.

### B. Futility

■ We turn to the merits of the State's claim that the trial court erred in finding that the merit Employees' pursuit of administrative remedies would have been futile. To prevail upon a claim of futility, "one must show that the administrative agency was powerless to effect a remedy or that it would have been impossible or fruitless and of no value under the circumstances." *M–Plan,* 809 N.E.2d at 840 (citation and quotation marks omitted).

---

tional" requirements that had previously been referred to as "jurisdiction over the particular case" do not implicate subject matter jurisdiction); *K.S. v. State,* 849 N.E.2d 538, 541–42 (Ind.2006) (explaining that claims of procedural error are frequently mischaracterized as claims of jurisdictional dimension). Our supreme court's decision in *Ind. Family & Soc. Serv. Admin. v. Meyer,* 927 N.E.2d 367 (Ind. 2010), appears to leave unresolved the question of whether or not the failure to follow statutory requirements, which could arguably

include exhausting administrative remedies, is more appropriately described as procedural error or lack of subject matter jurisdiction.

**17.** An affirmative defense is defined as a "defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all the allegations in the complaint are true." BLACK'S LAW DICTIONARY 451 (8th ed. 2004).

Here, the trial court found (1) that the attorney for the SPD acknowledged in his deposition that prior to *Arden* there was no relief available to the Employees from either the SEAC or the SPD and (2) that prior to *Arden* all claims involving the change of work hours were denied. Appellants' Br. at 59. Our review of the record before us discloses that Keith Beesley, an SPD staff attorney and the State's deposition representative pursuant to Trial Rule 30(B)(6), testified that between 100 and 150 employees filed grievances regarding the split classification pay disparity but "[p]rior to the [*Arden*] decision there was no relief to be had over the difference in hours of work from either the [SPD] or the [SEAC]." Appellees' App. Vol. 2 at 274. Beesley was then asked, "If I understand you correctly, when you say there was no relief to be had, it was the interpretation or the decision, if you will, of the State that those types of claimants were not entitled to relief prior to the [*Arden*] decision." *Id.* Beesley replied, "It was our honest belief that we were complying with the law." *Id.* We conclude that Beesley's testimony establishes that it would have been fruitless for the merit Employees to pursue their administrative remedies.

The State asserts that following *Arden,* the SPD and the SEAC changed their legal position regarding the split classification pay disparity and in support thereof argues that some grievances were settled in favor of the employee after *Arden.* The record reveals that the aforementioned grievances were filed before *Arden* and had been held in abeyance pending this Court's decision in that case. Any alteration in the State's legal position following *Arden* cannot diminish the uncontroverted evidence that all grievances filed before *Arden* would have been denied because of the State's legal position.

Nevertheless, the State contends that "the mere fact that the agency might rule against [a] party does not mean that [the] exhaustion requirement may be disregarded[,]" citing *Johnson,* 829 N.E.2d 979 and *Patriotic Fireworks,* 871 N.E.2d 989. Appellants' Br. at 22–23. In *Johnson,* a fireworks wholesaler brought an action against the state fire marshal arguing that the fire marshal misinterpreted the annual fee statute [18] governing wholesalers who sold restricted fireworks. The fire marshal interpreted the statute to require wholesalers to pay annual fees for all locations operated by a wholesaler. The wholesaler contended that the statute required that it pay only one annual fee. The wholesaler claimed, inter alia, that it would have been futile to pursue its administrative remedies. The supreme court stated,

> The principal thrust of Celebration's futility argument actually seems to be that it believes it to be inevitable that the agency would rule against it. That may be so; Celebration's legal argument seems to us unlikely to prevail. But the mere fact that an administrative agency might refuse to provide the relief requested does not amount to futility. And even if Celebration is unsuccessful in an administrative challenge, resort to the Commission may produce a reasoned explanation of the considerations going into the Fire Marshal's position. That in itself would be of value before resort to the courts to resolve such an issue. [*M–Plan, Inc.,* 809 N.E.2d at 839–40] (citing *Turner v. City of Evansville,* 740 N.E.2d 860, 862 (Ind.2001) (noting one of the benefits of exhaustion of administrative remedies is that a record for judicial review may be created)). 829 N.E.2d at 984 (some citations omitted).

18. Ind.Code § 22–11–14–5.

*Patriotic Fireworks* involved the same dispute as that in *Johnson*, entailing fireworks wholesalers, the annual fee statute, and the state fire marshal. Another panel of this Court relied on *Johnson* to reject the wholesalers' futility argument.

Both cases are distinguishable from the case at bar for exactly the same reasons. First, the evidence here does not demonstrate that the SPD and SEAC *might* have denied relief on any grievances regarding the pay disparity; it shows that there was "*no* relief to be had[.]"[19] Appellees' App. Vol. 2 at 274. Second, in *Johnson* and *Patriotic Fireworks*, the agency had had *no* opportunity to address the wholesalers' objection to its implementation of the annual fee statute. Here, a record as to the SPD's legal position on the pay disparity had already been established. *See Arden,* 578 N.E.2d at 772 ("[T]he State argues that like-classified employees receive equal pay, regardless of whether they work 40 hours or 37.5 hours for that pay, because the effective hourly wage is immaterial: only the biweekly salary matter, and the biweekly salaries are the same.").

Still, the State claims that the administrative process was necessary to create a factual record for each employee to determine whether and when the employee was in a split class. We reject this claim because prior to *Arden* the State denied all grievances on non-fact specific, purely legal grounds. *See* Appellees' App. Vol. 2 at 274 (Beesley's testimony that the SPD's denials were based on its interpretation of the law).

We conclude that the State has failed to demonstrate the existence of a genuine issue of material fact regarding the futility of the administrative process. Therefore, the trial court did not err in finding that the exhaustion of administrative remedies was futile, and we affirm its summary judgment ruling against the State and in favor of the merit Employees.

## II. Class Certification

▬▬▬ The State challenges the trial court's certification of a plaintiffs' class. Whether the prerequisites to class certification have been met is a question of fact for the trial court. *Hefty v. All Other Members of the Certified Settlement Class,* 680 N.E.2d 843, 851 (Ind.1997). "Appellate courts reviewing a class certification employ an abuse of discretion standard."[20] *Associated Med. Networks, Ltd. v. Lewis,* 824 N.E.2d 679, 682 (Ind.2005). If the evidence most favorable to the judgment and all reasonable inferences drawn therefrom support the trial court's decision, we will affirm. *Ind. Bus. Coll. v. Hollowell,* 818 N.E.2d 943, 949 (Ind.Ct.App.2004). In reviewing the trial court's certification, we neither reweigh the evidence nor judge the credibility of witnesses. *Id.* "The representative plaintiffs have the burden to

---

19. The State contends that *Arden* and *State Employees' Appeal Commission v. Bishop,* 741 N.E.2d 1229 (Ind.2001), show that employees could receive relief through the administrative/judicial process. However, the ability to appeal a denial from the administrative agency is irrelevant to the issue of whether the administrative process itself is futile.

20. The State asserts that our standard of review is de novo because this appeal involves a question of statutory interpretation, citing *Lemon v. Wishard Health Services,* 902 N.E.2d 297 (Ind.Ct.App.2009), *trans. denied.* The State misapplies *Lemon.* In *Lemon,* the question of statutory interpretation involved whether the Wage Claims Act required potential class members to submit their wage claims to the Indiana Department of Labor before they were permitted to be members of a class action. *Id.* at 300–02. The *Lemon* court was not asked to consider the trial court's application of Trial Rule 23. Here, we are not called on to interpret the AOPA or the SPA but rather to review the trial court's application of Trial Rule 23, and therefore we apply an abuse of discretion standard.

show that all requirements for class certification have been met." *Rene ex rel. Rene v. Reed,* 726 N.E.2d 808, 816–17 (Ind.Ct. App.2000). Failure to meet any one of the mandated requirements results in the denial of class status. *Id.* at 817. "Because of the similarity between [Indiana Trial Rule] 23 and the concomitant federal rule, we may utilize federal law in resolving any questions which may arise." *Kaufmann v. Credithrift Fin., Inc.,* 465 N.E.2d 207, 209 (Ind.Ct.App.1984).

### A. Trial Rule 23(A)

The State argues that the class fails to meet requirements (2) through (4) of Indiana Trial Rule 23(A),[21] which provides as follows:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if:
>
> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Turning first to whether questions of law or fact are common to the class, we observe that "[c]ommonality is satisfied by a finding that the plaintiffs' claims derived from a common nucleus of operative fact. A common nucleus of operative fact exists where there is a common course of conduct." *Hollowell,* 818 N.E.2d at 950 (citations and quotation marks omitted). Here, the common nucleus of opera-

tive fact consists of the following: (1) each plaintiff was a state employee during the class period; (2) each was required to work 40 hours per week while other state employees in the same job classification were required to work only 37.5 hours; (3) each had an employment contract with the State (discussed in Sections III and IV, *infra*); and (4) the State breached its employment contracts by requiring the class members to work 40 hours per week for the same salary as their counterparts working only 37.5 hours per week.

The State contends that the commonality requirement is not satisfied because the "equal pay for comparable work" provision does not apply to the nonmerit Employees and their lawsuit relies on a different legal theory. The State also claims that there are factual differences among the Employees that preclude certification, such as (1) some always worked 40 hours per week, while others initially worked 37.5 hours per week and were required to increase their hours to 40 per week; (2) some Employees, such as correctional officers, had paid lunches; (3) some Employees had state vehicles as part of their compensation; (4) some state institutions were not in compliance with the 40–hour work week rule during the class period; (5) overtime eligibility changed multiple times during the class period; (6) some employees listed as working in the class of correctional officer were not actually doing the work of correctional officers during the relevant time; and (7) class representative Sutcliffe was in the classification of "Highway Engineer III" for a period, which was a classification that a plaintiffs' expert testified should not recover damages.[22]

---

21. The State also argues that class certification of the merit Employees was improper because they failed to exhaust administrative remedies. Because we have concluded that exhaustion of administrative remedies was futile, we need not address this argument.

22. The State also asserts that another difference that precludes certification is that some

We are unpersuaded that these legal and factual differences preclude certification. Here, the trial court created four sub-classes of plaintiffs: merit/overtime-eligible; merit/overtime-exempt; non-merit/overtime-eligible; and non-merit/overtime-exempt. These sub-classes take into consideration the most significant legal and factual differences that exist among the plaintiffs. Other differences are either insignificant or could be addressed in determining damages.

■■■■ As to whether the claims of the representative parties are typical of the claims of the class, we note that typicality focuses on the desired characteristics of the class representatives. *Matter of Tina T.*, 579 N.E.2d 48, 54 (Ind.1991). Class certification is improper where one or more class representatives fails to possess the same interest and suffer the same injury as the class as a whole. *Y.A. by Fleener v. Bayh*, 657 N.E.2d 410, 418 (Ind. Ct.App.1995), *trans. denied* (1996). We think that the four sub-classes insure that this requirement is met: each sub-class representative possesses the same interest and suffered the same injury as the sub-class as a whole.

■■■■ Finally, the State claims that the divergent interests of the persons included in the class also prevent the named plaintiffs from adequately representing the class as a whole. The adequacy requirement of Trial Rule 23(A)(4) consists of three components:

1) the chosen class representative cannot have antagonistic or conflicting claims with other members of the class; 2) the named representative must have a sufficient interest in the outcome to ensure vigorous advocacy; and 3) counsel for the named plaintiff must be competent, experienced, qualified, and generally able to conduct the proposed litigation vigorously.

*N. Ind. Pub. Serv. Co. v. Bolka*, 693 N.E.2d 613, 618 (Ind.Ct.App.1998), *trans. denied.* The State argues that *Arden* determined only that merit/overtime-eligible employees were entitled to equal pay for comparable work, and that the class members falling within or without that category have conflicts, as some may have standing to pursue their claims through the administrative process and some do not. Because we have concluded that the merit Employees were excused from exhausting their administrative remedies and the trial court created four sub-classes, this argument is of no moment. We conclude that the trial court did not abuse its discretion in finding that the requirements of Trial Rule 23(A) were met.

### B. Trial Rule 23(B)

■■■ The State also asserts that the predominance requirement of Trial Rule 23(B)(3) was unsatisfied. Trial Rule 23(B)(3) reads,

An action may be maintained as a class action if the prerequisites of subdivision (A) are satisfied, and in addition:

(3) the court finds that *the questions of law or fact common to the members of the class predominate over any questions affecting only individual members,* and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include:

(a) the interest of members of the class in individually controlling the

class members filed grievances and others did not. However, the differences in class members' use or nonuse of the administrative grievance procedure are irrelevant because all class members were excused from exhausting administrative remedies.

prosecution or defense of separate actions;

(b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

(c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;

(d) the difficulties likely to be encountered in the management of a class action.

(Emphasis added.)

As to whether common questions of law or fact predominate over individual questions, this Court has explained that

[t]here is no precise test for determining whether common questions of law or fact predominate; instead, Indiana Trial Rule 23(B)(3) requires a pragmatic assessment of the entire action and all the issues involved. In making this decision, we consider whether the substantive elements of class members' claims require the same proof for each class member; whether the proposed class is bound together by a mutual interest in resolving common questions more than it is divided by individual interests; whether the resolution of an issue common to the class would significantly advance the litigation; whether one or more common issues constitute significant parts of each class member's individual cases; whether the common questions are central to all of the members' claims; and whether the same theory of liability is asserted by or against all class members, and all defendants raise the same basic defenses.

*7–Eleven, Inc. v. Bowens,* 857 N.E.2d 382, 393–94 (Ind.Ct.App.2006) (citations omitted).

The State contends that there are too many factual differences among plaintiffs, that plaintiffs could not amalgamate multiple contract actions into one, and that their claims for damages are inherently individualized. To bolster its argument, the State cites *Broussard v. Meineke Discount Muffler Shops, Inc.,* 155 F.3d 331 (4th Cir.1998). There, franchisees sued franchisor for breach of contract. The Fourth Circuit held that class certification was improper because, inter alia, the franchisees' collective breach of contract action was based on multiple different contracts. *Id.* at 340. *Broussard* is distinguishable. There, each franchisee had a separate contract with the franchisor. Here, the Employees within each sub-class had the identical contractual relationship with the State. We cannot say that the trial court abused its discretion in finding that common issues predominate over individualized issues.

### C. Trial Rule 23(C)(1)

The State further argues that certification was improper under Trial Rule 23(C)(1), which provides, "As soon as practicable after the commencement of an action brought as a class action, the court, upon hearing or waiver of hearing, shall determine by order whether it is to be so maintained." Specifically, the State asserts that the trial court could not certify a class subsequent to its August 1998 summary judgment ruling. In support, the State cites *Peritz v. Liberty Loan Corp.,* 523 F.2d 349 (7th Cir.1975). In *Peritz,* the district court delayed consideration of the class action status until after a jury trial was held. The Seventh Circuit held that the language of the substantially similar Federal Rule 23(c)(1) "makes it plain" that "the order determining class status is to be made and finalized before the decision on the merits." *Id.* at 354. The Seventh Circuit concluded that "certification of the class was delayed beyond the permissible period allowed by the rule." *Id.*

*Peritz* is distinguishable. The plaintiffs in *Peritz* did not seek certification, and they moved for summary judgment on the merits prior to certification.[23] Here, the Employees sought class certification in October 1993, shortly after filing suit, and it was *the State* that first moved for summary judgment prior to the resolution of the class certification issue. In *Postow v. OBA Federal Savings & Loan Ass'n*, 627 F.2d 1370 (D.C.Cir.1980), the court stated,

> [T]he strongest argument ... preclud[ing] post-judgment class certification is that pre-judgment certification and notice to the class are necessary to protect the defendant from future suits by potential members of the class. But that rationale disappears when the defendant himself moves for summary judgment before a decision on class certification.

*Id.* at 1382 (citing *Haas v. Pittsburgh Nat'l Bank*, 381 F.Supp. 801 (W.D.Pa.1974), *rev'd on other grounds*, 526 F.2d 1083 (3d Cir.1975)). Because the State chose to move for summary judgment, the State has waived any argument under Trial Rule 23(C)(1). A contrary decision would allow defendants to avoid class certification by immediately moving for summary judgment, which would not serve the policy purposes set out by the *Postow* Court.

## III. Merit Employees' Claim and the Equal Pay for Comparable Work Provision

The State contends that the trial court committed clear error in concluding that because the State violated 31 Indiana Administrative Code 2–4–2, the "equal pay for comparable work" provision, the merit Employees were entitled to damages for breach of employment contract.[24] *See* Appellants' Br. at 79 (Final Judgment, Conclusions 13–15). The State presents two arguments: (1) the SPA does not provide a private right of action; and (2) the trial court erred in finding that the State breached its contracts with the merit Employees.

The State's contentions are unavailing. In *Whinery v. Roberson*, 819 N.E.2d 465 (Ind.Ct.App.2004), *trans. dismissed* (2006), we stated,

> verify a class before a determination on the merits. 411 N.E.2d at 402.

In *Doody*, the plaintiff's complaint contained two counts, with Count II merely restating Count I in the language of a class action. The plaintiff moved for summary judgment on Count I, which the trial court granted. On appeal, the *Doody* court noted that the trial court disposed of the merits on Count II when it rendered judgment on Count I, and therefore held that the trial court erred in deciding to hold a hearing on class certification after it had rendered judgment on the merits. 556 N.E.2d at 1361–62.

23. The State also cites *Bowen v. Sonnenburg*, 411 N.E.2d 390 (Ind.Ct.App.1980), and *State v. Doody*, 556 N.E.2d 1357 (Ind.Ct.App.1990), *trans. denied*. As in *Peritz*, in both these cases the plaintiffs moved for summary judgment on the merits, and therefore, both cases are distinguishable. In *Bowen*, the plaintiffs, patients in state institutions for the mentally handicapped and mentally retarded, filed a motion for partial summary judgment in which they sought judgment that the action was a proper class action, that they had performed valuable services for the defendants, and that the defendants were obligated to pay them the minimum wage and had failed to do so. The trial court granted the plaintiffs' summary judgment motion and simultaneously issued an order determining that the action was properly maintainable as a class action. On appeal, the *Bowen* court noted that by granting the plaintiffs' summary judgment motion, the trial court had determined the merits of the case, and it was necessary to

24. The State asserts, and the Employees concede, that the "equal pay for comparable work" provision does not apply to the nonmerit Employees, and therefore the nonmerit Employees cannot sustain a claim based thereon. The nonmerit Employees' theory of recovery is addressed in Section IV, *infra*.

A government employee may sue for violation of employment rights in contract, and the terms and conditions of the employee's contract include *all relevant statutory provisions* as if such provisions were specifically set out in the contract. A government employee's relationship with the State, although not necessarily defined by a written employment contract, is purely contractual. Laws having to do with remuneration become part of the employment contract, and so attach themselves as an incident thereof.

*Id.* at 473 (citations and quotation marks omitted) (emphasis added). The State argues that *Whinery* is inapplicable because it did not involve merit employees or the SPA. However, the State fails to articulate any rationale, nor do we discern any, that *Whinery* should not apply to merit employees and the SPA. The merit employees have a contractual relationship with the State, which the State concedes, and the SPA and applicable AOPA rules are necessarily part of their employment contract.[25]

Further, the State erroneously frames the merit Employees' claim in terms of a statutory private cause of action. The merit Employees need not rely on the existence of a private right of action under the SPA because this suit is a breach of contract action.[26] As such, the State's reliance on *Americanos v. State,* 728 N.E.2d 895 (Ind.Ct.App.2000), *trans. denied,* is

misplaced. In *Americanos,* the plaintiff sued the State as *an applicant* for state employment. We affirmed the dismissal of his complaint, concluding that "the legislature did not intend to confer a private right of action for a violation of the State Personnel Act." *Id.* at 897. *Americanos* was not, nor could it have been, a breach of contract action. The plaintiff could not maintain a breach of contract claim against the State because he was not a state employee and therefore did not have a contractual relationship with the State. Here, the Employees have a contractual relationship with the State.

As to whether the State breached the "equal pay for comparable work" provision, *Arden* is dispositive. The State argues that *Arden* is distinguishable because the plaintiffs there exhausted their administrative remedies. That distinction is meaningless because the merit Employees are excused from exhausting their administrative remedies.[27]

### B. Overtime–Exempt Employees

In a separate argument, the State claims that as a matter of law an overtime-exempt employee is precluded from recovering damages for having to work forty hours per week. The State asserts that the trial court erred in finding otherwise. In support, the State relies on *Arden,* in which the overtime-exempt employees were held to be ineligible for relief under the "equal pay for comparable work" pro-

---

25. The State contends that *Whinery* does not support the Employees' claim for damages because the plaintiffs in *Whinery* were not awarded damages. The State is mistaken. Regarding the SPD's violation of the employees' contractual rights, the *Whinery* court concluded that the employees' "contractual recovery will be limited to what the [e]mployees may recover under the [salary increase statute]." 819 N.E.2d at 474.

26. For example, *Whinery* addressed two distinct issues: (1) whether there was a contract

right conferred by the salary increase statute that was breached by the State's failure to comply with its provisions; and (2) whether the salary increase statute created a statutory remedy, that is, a private cause of action, that allowed the employees to enjoin the SPD. 819 N.E.2d at 472–74.

27. At oral argument, that State conceded that if the administrative process was found to be futile, *Arden* was dispositive.

vision because they did not have counterparts that worked 37.5 hours per week. 578 N.E.2d at 773. The *Arden* court determined that if "there is no comparable work, then there can be no violation of the equal pay for comparable work rule, and we need not discuss the question of equal pay." *Id.* This implies that had the overtime-exempt employees had counterparts working 37.5 hours per week, the *Arden* court would have gone on to discuss the question of equal pay. Accordingly, we do not read *Arden* as barring the claims of overtime-exempt employees under all circumstances. *Arden* does not exclude the possibility that overtime-exempt employees could be entitled to relief if they have counterparts that worked 37.5 hours per week. Here, our review of the record before us shows that merit/overtime-exempt employees, such as the "Social Worker IV" job classification, had counterparts working 37.5 hours per week. Appellants' App. Vol. 7 at 1423. In fact, the State concedes that it "never claimed that there are not overtime-exempt employees who worked in split classes." Appellants' Reply Br. at 19. Accordingly, we find no error in the trial court's finding that overtime-exempt employees are not, as a matter of law, precluded from recovering damages. We conclude that the trial court did not commit clear error in finding that the State breached "the equal pay for comparable work" provision and that all merit Employees are entitled to back pay.

### IV. Non–Merit Employees' Claim

The parties agree that the nonmerit Employees cannot proceed with a claim that the State violated the "equal pay for comparable work" provision because it applies only to merit Employees. Although not the basis for the trial court's finding in

favor of the nonmerit Employees, they assert that the State breached Article 1, Section 23 of the Indiana Constitution, also known as the Privileges and Immunities Clause, which, they contend, is incorporated into their employment contracts.[28] *See Whinery*, 819 N.E.2d at 473 (stating that government employee's relationship with State is "purely contractual"). The State argues that the nonmerit Employees' claim fails because no Indiana cases have held that a breach of contract action for alleged violations of the Indiana Constitution exists, and that even if a valid breach of contract claim existed, the nonmerit Employees' claim would fail on the merits.

### A. Breach of Contract Claim Pursuant to the Indiana Constitution

The non-merit Employees contend that this Court has characterized state employees' claims of constitutional violations by the State in connection with their employment as contractual claims, citing *City of Terre Haute v. Brighton*, 450 N.E.2d 1039 (Ind.Ct.App.1983), and *Bernhardt v. State*, 479 N.E.2d 1367 (Ind.Ct.App.1985), *trans. denied* (1986), two similar cases.

In *Brighton*, the employees were fire fighters claiming that the city breached their employment contracts, violated certain statutes, and violated their constitutional rights to due process. 450 N.E.2d at 1040. The city argued that because the fire fighters raised constitutional issues, the action was governed by the Indiana Tort Claims Act. The *Brighton* court disagreed. The court observed that the fire fighters' tenure statute, Indiana Code Section 36–8–3–4, required notice and an opportunity for a hearing before an employee could be removed from office or grade, which was a property interest that was protected by the Due Process Clause of

---

**28.** The Employees note that Article 1, Section 23 also applies to the merit Employees, but because the "equal pay for comparable work" provision applies to the merit Employees, they concede that the constitutional argument is immaterial. Appellees' Br. at 24 n. 16.

the Fourteenth Amendment of the United States Constitution. *See id.* at 1041 ("A 'property' interest is created and defined by existing rules or understandings stemming from a source independent of the constitution, such as state law, which provides rules that secure benefits and support claims of entitlement to those benefits."). The *Brighton* court found that the fire fighters had a contractual relationship with the city and concluded that although "the fire fighters' relationships with the City involved constitutional rights, th[e] action sound[ed] in contract, not tort." *Id.* at 1042.

In *Bernhardt*, the employee claimed that the State breached her employment contract by terminating her for, among other reasons, exercising her constitutionally-protected rights to free speech and freedom of association.[29] 479 N.E.2d at 1369. As in *Brighton*, the issue in *Bernhardt* was the applicability of the Tort Claims Act. The *Bernhardt* court found that the Tort Claims Act did not apply, reasoning as follows:

> Bernhardt's relationship with the State is contractual. *See, City of Terre Haute v. Brighton* (1983), Ind.App., 450 N.E.2d 1039, 1040–1041; *City of Michigan City v. Austin* (1982), Ind.App., 442 N.E.2d 705, 714, *reh. denied; Wencke v. City of Indianapolis* (1981), Ind.App., 429 N.E.2d 295, 297, *reh. denied; Foley v. Consolidated City of Indianapolis* (1981), Ind.App., 421 N.E.2d 1160, 1163, *trans. denied; State ex rel. Crooke v. Lugar* (1976), 171 Ind.App. 60, 354 N.E.2d 755, 761, *reh. denied; State ex*

> *rel. Palm v. City of Brazil* (1947), 225 Ind. 308, 315, 73 N.E.2d 485, 488. *Cf, New Albany Forge and Rolling Mill v. Cooper* (1892), 131 Ind. 363, 369, 30 N.E. 294, 296; *Miller v. State* (1972), 153 Ind.App. 54, 61, 285 N.E.2d 843, 847; *Michel v. Forde* (1963), 135 Ind.App. 360, 372, 191 N.E.2d 507, 513; *McDowell v. Duer* (1922), 78 Ind.App. 440, 444, 133 N.E. 839, 840; *Rogers v. Rogers* (1919), 70 Ind.App. 659, 668, 122 N.E. 778, 780.

> The terms and conditions of an employment contract include all relevant statutory provisions as if such provisions were strictly set out in the contract. *See, e.g., Morrison v. McMahon* (1985), Ind.App., 475 N.E.2d 1174; *Foley v. Consolidated City of Indianapolis*, 421 N.E.2d at 1163; *Wencke v. City of Indianapolis*, 429 N.E.2d at 297. A State employee's contract is regulated by the terms of the state personnel act, IND. CODE 4–15–2–1 through 4–15–2–46, and the regulations related thereto, 31 I.A.C. 1–1–1 et seq.

> Bernhardt's complaint here states a claim under her contract of employment. It is sufficient to put the State on notice thereof. Here, *any duties between Bernhardt and the State arose out of the employer-employee contractual relationship. The claim may involve constitutional rights but the action arises from the employment relationship and sounds in contract, not tort.*

*Id.* (some citations omitted) (emphasis added).[30]

---

**29.** The *Bernhardt* court did not specify whether Bernhardt alleged state or federal constitution violations.

**30.** The State claims that the nonmerit Employees' representation of the *Bernhardt* holding contradicts the holding in *Cantrell v. Morris*, 849 N.E.2d 488, 498, 507 (Ind.2006). We disagree. In *Cantrell*, our supreme court ad-

dressed whether an employee of a state or local governmental agency whose discharge was alleged to have violated free speech rights guaranteed by *Article 1, Section 9 of the Indiana Constitution* could assert a claim for money damages against governmental entities. *Id.* at 491. The *Cantrell* court concluded that whether or not *Article 1, Section 9*

 Although previously stated in conjunction with our analysis of the merit Employees' claim, it bears repeating that as a general proposition "[a] government employee may sue for violation of employment rights in contract, and the terms and conditions of the employee's contract include *all relevant statutory provisions* as if such provisions were specifically set out in the contract." *Whinery*, 819 N.E.2d at 473. "Laws having to do with remuneration become part of the employment contract, and so attach themselves as an incident thereof." *Id.* We think that *Brighton, Bernhardt*, and *Whinery* support the proposition that *relevant* state constitutional provisions are part of the state employees' contractual relationship with the State. We consider relevant those constitutional provisions having to do with remuneration. Here, the nonmerit Employees rely on the Equal Privileges and Immunities Clause. We think there is no question that the Equal Privileges and Immunities Clause is relevant to the compensation the State provides to its employees. Accordingly, we hold that the Equal Privileges and Immunities Clause is part of the terms and conditions of the nonmerit Employees' employment contracts with the State.

### B. Substance of Nonmerit Employees' Claim

 The State argues that the nonmerit Employees fail to state a claim for violation of the Equal Privileges and Immunities Clause of the Indiana Constitution. Article 1, Section 23 of the Indiana Constitution states that "[t]he General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms, shall not equally belong to all citizens."

 When determining whether a State law or regulation complies with Article 1, Section 23, we use the following two-prong analysis: (1) "the disparate treatment accorded by the legislation must be reasonably related to inherent characteristics which distinguish the unequally treated classes;" and (2) "the preferential treatment must be uniformly applicable and equally available to all persons similarly situated." *Collins v. Day*, 644 N.E.2d 72, 78–79 (Ind.1994). In addition, on review we must "exercise substantial deference to legislative discretion." *Id.* at 80. When alleging a violation of Article 1, Section 23, the challenging party has the burden to "negative every conceivable basis which might have supported the classification." *Id.*

The State argues that the inherent distinctions between any alleged disparate treatment are reasonably related to the inherent characteristics of state office work versus state institutional work. According to the State, the 37.5–hour work week of the state office employees insures that personnel are always available to conduct business when the state office is open to the public, and the 40–hour work week of the state institution employees insures that state institutions receive 24–hour coverage. Although the differences in required *work hours* is reasonably related to the inherent characteristics of state office work versus state institutional work, that is irrelevant in assessing the reasonableness of paying a lower hourly wage to an

---

affords any protection to public employees under some circumstances, a terminated employee has no private right of action for damages that arise under *that* section. *Id.* at 492. Our supreme court found that if public employees enjoy protection under Article 1, Section 9, then the remedy would be through a tort cause of action for wrongful discharge. *Id.* at 507. As previously stated, the current action is a breach of contract action for back wages. It is not a tort action for damages.

employee who works 40 hours per week than an employee in the exact same job classification who works only 37.5 hours per week. There is absolutely no reasonable basis for the *disparity in pay*.

Having determined that *Collins*'s first prong is unsatisfied, we need not address the second prong to conclude that the State breached its contractual obligation pursuant to the Equal Privileges and Immunities Clause.[31] As such, we find no error in the trial court's judgment in favor of the non-merit Employees.

### V. Merit Employees' Back Pay

The trial court found that the class period extended from at least September 19, 1973 (an early benchmark for the existence of split classes), until September 19, 1993, when the State abolished the split class system by moving all employees to a 37.5-hour work week. Thus, the State's monetary liability was based on the back pay owed to the Employees over this twenty-year period. However, the State argues that the merit Employees' back pay is limited to the period beginning ten days before the filing of the complaint, filed July 19, 1993, and ending September 12, 1993. According to the State, this ten-day limitation is based on the fact that merit Employees were required to file any grievance regarding working conditions within ten days after the condition arose pursuant to Indiana Code Section 4–15–2–35 and former 31 Indiana Administrative Code 2–13–1. Former 31 Indiana Administrative Code 2–13–1 provided,

[T]he complaint procedure shall be initiated as soon as possible after the occurrence of the act or condition complained of and in no event shall be initiated more than ten (10) calendar days after the employee is notified of a change in his status of employment or after an unsatisfactory condition of employment is created. Failure to initiate the complaint procedure within such time period shall render the complaint procedure unavailable to the employee.[32]

The State relies on our supreme court's decision in *State Employees' Appeal Commission v. Bishop*, 741 N.E.2d 1229 (Ind. 2001) (*"Bishop II"*), a consolidation of *Indiana State Employees' Appeals Commission v. Greene*, 716 N.E.2d 54, 57–58 (Ind.Ct.App.1999), and *Indiana State Employees' Appeal Commission v. Bishop*, 721 N.E.2d 881, 884–85 (Ind.Ct.App.1999) (*"Bishop I"*). In *Greene* and *Bishop I*, state clerical employees of the Rockville Training Center filed grievances with the SEAC complaining of unlawful pay disparity because they were working 40 hours per week while clerical workers at state offices were working 37.5 hours per week. The SEAC denied their claims, save one, as untimely. The trial court reversed the SEAC's decision, finding that the employees' claims were timely filed and that they were entitled to back pay beginning from the date of hire. The SEAC appealed, and the Court of Appeals held that the employees were entitled to back pay but only for a time period *beginning ten days before they filed their respective complaints. See*

---

31. The nonmerit Employees also assert that the State breached Article 1, Section 21 of the Indiana Constitution, also known as the Just Compensation Clause, which states, "No person's particular services shall be demanded, without just compensation." Having found that the State breached the nonmerit Employees' contractual rights pursuant to the Equal Privileges and Immunities Clause, we need

not address the nonmerit Employees' claim regarding the Just Compensation Clause and express no opinion as to whether they could demonstrate a valid claim that the State violated it.

32. 31 Indiana Administrative Code 2–13–1(a) was amended July 1, 1995, increasing the limitations period from ten to thirty days.

*Greene,* 716 N.E.2d at 57–58; *Bishop I,* 721 N.E.2d at 884–85. In reaching this decision, another panel of this Court reasoned as follows:

> The ten-day provision in 31 IAC 2–13–1(A) exists to provide the State with notice and an opportunity to correct unsatisfactory conditions of employment in a timely fashion before substantial damages accrue. To allow an employee to recover back pay for a period greater than ten days prior to the filing of the complaint putting the employer on notice of the unsatisfactory employment condition would undermine this purpose.

*Greene,* 716 N.E.2d at 57; *see also Bishop I,* 721 N.E.2d at 885 ("The purpose of the limitations period would be undermined if the employee were allowed to recover back pay for a period greater than ten days prior to filing the complaint.").

The employees petitioned for transfer, arguing that the Court of Appeals' opinions conflicted with *State v. Martin,* 460 N.E.2d 986 (Ind.Ct.App.1984), which permitted a group of Indiana State Prison teachers to receive back pay from the beginning of the time period that they experienced the effect of the pay disparity. *Id.* at 991. Our supreme court rejected the employees' argument, summarily affirmed the opinions of the Court of Appeals, and disapproved the decision in *Martin. Bishop II,* 741 N.E.2d at 1230.

The merit Employees contend that *Greene, Bishop I,* and *Bishop II* are irrelevant because they did not address which statute of limitations applies when claimants are excused from having to exhaust administrative remedies. However, the ten-day limit on back pay is unrelated to the statute of limitation on bringing suit. The statute of limitations controls access to the courts. The amount of back pay to which a successful litigant is entitled constitutes another question entirely. Furthermore, although the *Greene* and *Bishop I* petitioners followed the administrative grievance process, while here the Employees were excused from that process, that difference is simply not sufficiently compelling to justify an award of damages to merit Employees greater than that received by the *Greene* and *Bishop I* petitioners.

The Employees assert that because they are properly excused from having to comply with the administrative grievance process, they are not bound by any of the procedural requirements of that process. We disagree. "[A]ll relevant statutory provisions" are part of the merit Employees' contractual relationship with the State. *Whinery,* 819 N.E.2d at 473. Excusal from the administrative grievance process, which permits immediate access to the courts, does not nullify the contractual nature of all the relevant statutory provisions.[33] Accordingly, we conclude

---

**33.** The merit Employees cite *Dalesandro v. International Paper Co.,* 214 F.R.D. 473 (S.D.Ohio 2003), claiming that the district court held that the doctrine of futility excused employees who failed to file claims for severance pay under the federal Employee Retirement Income Security Act ("ERISA") and that "the ERISA plan's one-year filing deadline did not apply to the non-filers; only the 'statutorily imposed limitations period' was relevant to the non-filers' claims." Appellees' Br. at 32 (quoting *Dalesandro,* 214 F.R.D. at

482). The Employees mischaracterize *Dalesandro.*

In *Dalesandro,* plaintiffs moved the court to certify a class of plaintiffs consisting of salaried employees who were terminated from International Paper and then hired by another paper company and who did not receive severance benefits. Some plaintiffs had submitted claims for severance pay in accordance with ERISA's requirements and some had not. International Paper argued that because the non-filers had not filed claims, they did not have colorable claims and therefore

that the merit Employees' back pay is limited to ten days before their complaint was filed until the split class system was abolished.

We note that Indiana Code Section 4-15-2-35 and former 31 Indiana Administrative Code 2-13-1 apply only to merit Employees. As to how these rules are applied, we think that *Greene, Bishop I,* and *Bishop II* are dispositive. However, we recognize that the effect creates an apparent anomaly. Indiana Code Section 4-15-2-35 and former 31 Indiana Administrative Code 2-13-1 do not apply to non-merit Employees and cannot be considered part of their contractual relationship with the State, so their back pay is not limited by the ten-day rule. Nevertheless, we are constrained to follow our supreme court's pronouncement in *Bishop II.* The enterprise of creating law is outside our sphere of authority. Although our supreme court has the ability to revisit the issue and redefine the law, until that time, we are obliged to apply it as it currently exists.

■ Accordingly, we reverse the trial court's damage award as to the merit Employees and remand with instructions to recalculate their damages based on the time period beginning ten days before the filing of the complaint and ending when the State abolished the split class system. As a final matter, we note that although

the trial court found that the State abolished the "split class" system on September 19, 1993, the State asserts that it was September 12, 1993, citing *Greene,* 716 N.E.2d at 57–58, and *Bishop I,* 721 N.E.2d at 885. The State contends that therefore the merit Employees' back pay is limited to a period of about eight weeks. A review of the record before us does not reveal the exact date that the State ended the split class system. Therefore, on remand we instruct the trial court to determine whether the State abolished the split class system on September 12 or September 19, 1993, and to calculate the merit Employees' back pay accordingly.

## VI. Trial Court's Identification of Split Job Classifications

The State asserts that the trial court clearly erred in determining which plaintiffs were in split job classifications and when such classifications were split. The trial court found that the split classifications consisted of the job classifications listed on Plaintiffs' Exhibit C, with the exception of Psychiatric Attendant 4, Cook 1, Cook 3, and Teacher's Assistant 4. Appellants' Br. at 68, 73 (Findings 62, 103, 104). Plaintiffs' Exhibit C is a computer-generated document that was prepared by the SPD from its own data following the *Arden* decision to determine which job

---

were not participants in the ERISA plan. The *Dalesandro* court stated,

> Contrary to International Paper's contention, the Court views the issue of the non-filers' failure to file claims for severance benefits as one of exhaustion of administrative remedies rather than as one of standing. The cases cited by International Paper for the proposition that Plaintiffs are not participants because their claims are time-barred are distinguishable. [B]oth involved situations where the plaintiffs failed to file claims for benefits within the limitations period *established by statute.* Neither case held that the plaintiffs were not participants

> through application of the claims period established by the plan document. International Paper does not contend that claims of the non-filers are barred by a statutorily imposed limitations period.

214 F.R.D. at 482 (citations omitted) (emphasis in original). Thus, the *Dalesandro* court did not hold that the "statutorily imposed limitations period" was the only relevant rule governing the non-filers' claims, as merit Employees argue; instead, it stated that International Paper was *not arguing* that the non-filers' claims were barred by the statutorily imposed limitations period.

classifications were split classes.[34] It is a list of job classifications that specifies for each classification the number of agencies having that classification, the number of employees working 37.5 hours per week, the number of employees working 40 hours per week, the names of the agencies with employees working 40 hours per week, and the agencies with both types of employees. Appellants' App. Vol. 7 at 1403–27.

The State contends that Plaintiffs' Exhibit C is unreliable because (1) it contains numerous errors; (2) the job classification systems changed over time; and (3) the number of employees in each job classification changed on a daily basis.[35] In addition, the State argues that Exhibit C was created for union negotiations in response to the *Arden* decision and was never intended to show split classifications over the 20–year class period.

We note that Keith Beesley, a SPD staff attorney, testified that Plaintiffs' Exhibit C was "one of the most critical documents from our perspective[,]" that "it's a pretty fair representation" of the different classifications that might be affected by this lawsuit, and that "[i]t's what we use to make decisions." Appellants' App. Vol. 4 at 859, 867. The State's argument is merely an invitation to reweigh the evidence, which we must decline.[36]

### VII. *Plaintiffs' Exhibit C*

The State contends that not only is Exhibit C unreliable, it is inadmissible.[37] Our standard of review is well settled. A trial court's decision as to the admissibility of evidence is reviewed for an abuse of discretion. *Walker v. Cuppett*, 808 N.E.2d 85, 92 (Ind.Ct.App.2004). "An abuse of discretion occurs if the trial court's action is clearly erroneous and against the logic and effect of the facts and circumstances before the court." *Id.*

The State argues that Exhibit C is unreliable and therefore irrelevant and inadmissible under Indiana Evidence Rule 402, which provides that irrelevant evidence is inadmissible. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ind. Evidence Rule 401. As to Exhibit C's reliability, the previously cited testimony of Keith Beesley indicates that Exhibit C was reasonably trustworthy as to which job classifications were split, and we therefore conclude that it was relevant.[38] *See* Appellants' App. Vol. 4 at 859, 867.

The State next claims that Exhibit C was never authenticated or identified pursuant to Indiana Evidence Rule 901,

---

**34.** It is actually two documents, Exhibits C–1 and C–2, but distinguishing them is unnecessary.

**35.** The State also claims in passing that Plaintiffs' Exhibit C is inadmissible but does not develop this argument until section VII of its brief.

**36.** In addition, the Employees assert that the trial court's determination of which job classifications were split was supported by other sufficient evidence, citing Plaintiffs' Exhibit I, "State Personnel Department Employee Hours by Classification." Appellees' App. Vol. 1 at 3.

**37.** The Employees claim that the State waived its admissibility arguments by failing to raise them at trial, but a review of the record shows that the State did object on these grounds, even though it did not explicitly cite the applicable evidence rule.

**38.** "Even if proffered evidence or testimony is only marginally relevant, it is within the sound discretion of the trial court to admit it." *Houston v. State*, 730 N.E.2d 1247, 1250 (Ind.2000).

which requires authentication or identification "sufficient to support a finding that the matter in question is what its proponent claims." We observe that Beesley testified that "Exhibit C–1 and Exhibit C–2 are documents that were prepared by the [SPD] in our efforts to discern which classifications were, in fact, split classes as we have used that phrase here today." *Id.* at 856; *see also id.* at 853–76 (general discussion of Exhibit C). Accordingly, we conclude that Exhibit C was properly identified and authenticated.

■■■ The State also asserts that Exhibit C is inadmissible hearsay and does not fall within any hearsay exceptions. Hearsay is an out-of-court statement offered in evidence to prove the truth of the matter asserted. Ind. Evidence Rule 801(c). Hearsay is not admissible except as provided by law or by the rules of evidence. Ind. Evidence Rule 802.

The Employees argue that Exhibit C is not hearsay because it constitutes a statement by a party-opponent, citing Indiana Evidence Rule 801(d)(2). The State fails to respond to this argument. Evidence Rule 801(d)(2) provides that a statement is *not* hearsay if

> [t]he statement is offered against a party and is (A) the party's own statement, in either an individual or representative capacity; or (B) a statement of which the party has manifested an adoption or belief in its truth; or (C) a statement by a person authorized by the party to make a statement concerning the subject; or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship; or (E) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy.

A statement is defined as an oral or written assertion. Ind. Evid. Rule 801(a)(2). Exhibit C consists of a list of written assertions. Exhibit C was offered by the Employees as evidence against the State. The State concedes that Exhibit C is a document it prepared. Thus, it is the State's own statement. This Court has found that the Indiana rule on party-opponent statements applies against the government in civil and criminal cases. *See City of Indianapolis v. Taylor,* 707 N.E.2d 1047, 1057 (Ind.Ct.App.1999) (holding that statement of arresting officer or another police officer was not hearsay when used in wrongful death action against two police officers and the City of Indianapolis because it was a statement by a party-opponent), *trans. denied; Allen v. State,* 787 N.E.2d 473, 479 (Ind.Ct.App.2003) (concluding that statement of police officer of matter within the scope of officer's employment when introduced against State was not hearsay), *trans. denied.* Thus, we conclude that Exhibit C is a statement of a party-opponent pursuant to Indiana Evidence Rule 801(d)(2) and is not inadmissible hearsay.

### VIII. Plaintiffs' Damages Expert David Fuller

■■■ The trial court made the following relevant findings:

> (98) At trial, the Plaintiffs called as their expert witness David N. Fuller (hereinafter "Fuller"), the president of Value, Inc.

> (99) Fuller analyzed the State's own payroll and employment records, as well as data submitted by class members, in the process of calculating aggregate damages estimates for the class.

> . . .

> (101) The State provided to Fuller one hundred seventy-three (173) rolls of microfilm which it had preserved containing the payroll and employment rec-

ords of state employees during this period. Fuller found that one hundred fifty-six (156) of these rolls were usable and seventeen (17) were unable to be read.

. . .

(103) In his analysis, Fuller established two (2) separate sets of figures for damages, the first being $42,422,788.00, and the second being $49,682,993.00; the second figure included the positions of Psychiatric Attendant 4, Cook 1, Cook 3, and Teachers Assistant 4.

(104) Fuller testified that the latter calculation included the four (4) job classifications listed above which had been excluded from the first calculation because of the "possibility that they were not split classifications."

. . .

(106) Fuller also employed data taken from the claims submitted by employees after the parties had entered into their Preliminary Settlement agreement in August 2008, based on information provided for the claims period of September 1973 to September 1993.

(107) Fuller's total damage calculation based on adjusted eligible claims submitted was $81,989,273.00.

. . .

(110) In short, Fuller's first two (2) calculations were based on information provided by each individual claimant.

. . .

(115) The Court finds that, although there are admittedly gaps in the information which causes there to be an incomplete record due to the passage of time, the most reliable source of information of employment and pay records is contained in the microfilm records provided to Fuller by the State.

(116) Accordingly, the Court finds that the total amount of damages allow-able in this cause of action is $42,422,788.00.

(117) The Court takes judicial notice of the present economic conditions in this country and the possibility that entry of a judgment in this amount will not be widely appreciated for that reason. However, these are political considerations and not legal ones. The parties have had numerous opportunities to resolve this litigation over an extended number of years, in good economics [sic] times as well as bad, without the necessity of judicial intervention, and they have failed to do so. This decision today is the necessary result of that failure.

(118) It should be further noted that, while the Court regrets any discomfort that a judgment of this size may cause the State who will be required to pay it, a recent estimate showed that the State of Indiana spends approximately $38 million per day every day of the year (Indianapolis Star, June 26, 2009, at 1). The judgment entered by this Court today therefore represents barely more than what it costs the State of Indiana to operate for only one single day.

Appellants' Br. at 72–75.

The State contends that Fuller relied extensively on Exhibit C and that his conclusions are unreliable, as is clear from his issuance of four different opinions on damages. *See* Appellants' App. Vol. 5 at 993 (Fuller report dated June 18, 2008, estimating damages at $45 million); *id.* at 995 (Fuller report dated July 16, 2008, estimating damages at $42,422,788); *id.* at 996 (Fuller report dated February 2, 2009, estimating damages at $65 million); and *id.* at 997 (Fuller report dated March 3, 2009, estimating damages at $81.9 million). We are unpersuaded that the issuance of four different opinions suggests unreliability. The reports were based on different assumptions, such as which job classifications

were split. *See* Appellants' Br. at 73 (Finding 103, noting that the second report excluded four job classifications). The trial court was free to determine which report reflected its conclusions as to which job classifications were split.

In addition, we observe that the trial court found damages in the amount of $42,422,788. Thus, the trial court relied on Fuller's second report, dated July 16, 2008. Much of the State's argument regarding Fuller's reports focuses on the third and fourth reports, which were generated with the use of settlement data. Because the trial court did not base its damages calculations on those reports, the State's arguments are immaterial. We conclude that the trial court did not err in relying on Fuller's report to calculate damages.

### IX. Laches

Finally, the State argues that the Employees' claims are barred under the equitable doctrine of laches, which is " 'neglect for an unreasonable length of time, under circumstances permitting diligence, to do what in law should have been done.' " *In re Paternity of P.W.J.*, 846 N.E.2d 752, 759 (Ind.Ct.App.2006) (quoting *Knaus v. York*, 586 N.E.2d 909, 914 (Ind. Ct.App.1992)). Since the State is the party raising laches, it has the burden of proof by a preponderance of the evidence. *Huff v. Huff*, 895 N.E.2d 407, 410 (Ind.Ct.App. 2008). "A trial court has considerable latitude in deciding whether to invoke laches, and its decision will not be reversed on appeal absent an abuse of that discretion." *In re Bender*, 844 N.E.2d 170, 184 (Ind.Ct. App.2006), *trans. denied.* Laches has three elements that must be proven: " '(1) inexcusable delay in asserting a known right; (2) an implied waiver arising from knowing acquiescence in existing conditions; and (3) a change in circumstances causing prejudice to the adverse party.' " *SMDfund, Inc. v. Fort Wayne–Allen*

*County Airport Auth.*, 831 N.E.2d 725, 729 (Ind.2005) (quoting *Shafer v. Lambie*, 667 N.E.2d 226, 231 (Ind.Ct.App.1996)), *cert. denied* (2006).

Here, we may dispose of this issue by focusing on the third element, that is, prejudice. The State contends that "the delay has prejudiced defendants because it resulted in a $42 million judgment against defendants." Appellants' Br. at 54. The Employees counter that back pay does not constitute prejudice for purposes of a laches defense, citing *Cornetta v. United States*, 851 F.2d 1372 (Fed.Cir.1988). In *Cornetta*, a retired marine brought a wrongful discharge claim against the government. In discussing the prejudice prong of the government's laches defense, the court stated,

> There are two types of prejudice that may stem from delay in filing suit. First, the government may be unable to mount a defense. "Defense prejudice" may include loss of records, destruction of evidence, fading memories, or unavailability of witnesses. This is not an issue here in view of the government's concession. The second type, economic prejudice, centers on consequences, primarily monetary, to the government should the claimant prevail.

*Id.* at 1378 (citations omitted). The court rejected "the government's contention that Cornetta's potential receipt of back pay if he is successful on the merits is sufficient to support a laches bar." *Id.* at 1380. The court explained that if "back pay constitutes prejudice then virtually every suit could be said to be presumptively 'prejudicial.... If the potential receipt of back pay is deemed to satisfy the prejudice prong of the laches test, we will have judicially created an unpredictable, free floating, *de facto* statute of limitations[.]' " *Id.* at 1381.

Although *Cornetta* involved a claim of unlawful discharge from the United States Marine Corps, we find its reasoning persuasive. Here, the State has not shown that it has been prejudiced by expending any money that it would not have otherwise spent or taken any action that it otherwise would not have taken had the Employees brought their suit earlier. *Cf. SMDfund*, 831 N.E.2d at 731 (concluding that airport authority had established prejudice caused by delay where it issued bonds, incurred debt exceeding $44,000,000, and entered into leases and contracts, some of which extend for sixty-eight years into the future).

Nevertheless, in its reply brief, the State for the first time baldly asserts that "[n]ot only has the State suffered economic prejudice by plaintiffs' delay in the instant action, it has incurred defense prejudice as evidenced by sketchy records, records without adequate foundation and confused witnesses testifying about things that happened as much as 37 years ago." Appellants' Reply Br. at 22. We observe that we have determined that Exhibit C was sufficiently trustworthy to be admitted as evidence and that it was properly identified and authenticated. In any event, the State fails to expand on this assertion and fails to provide citations to the record. Therefore, it has waived this argument. *See Loomis v. Ameritech Corp.*, 764 N.E.2d 658, 668 (Ind.Ct.App.2002) (holding that appellants waived issue by not presenting a cognizable argument in support thereof), *trans. denied; see also* Ind. Appellate Rule 46(A)(8)(a) ("The argument must contain the contentions of the appellant on the issues presented, supported by cogent reasoning. Each contention must be supported by citations to the authorities, statutes, and the Appendix or parts of the Record on Appeal relied on. . . .").

Because all three elements must exist to prove laches and the State failed to carry its burden as to the third element, we need not address the remaining two elements. We conclude that laches does not bar the Employees' claims.

### Conclusion

We reverse the trial court's finding that the merit Employees, represented by Veregge and Strong, are entitled to twenty years of back pay and remand with instructions to recalculate the merit Employees' back pay based on the time period beginning ten days before the July 29, 1993, complaint was filed and ending when the State abolished the split class system. On remand, we instruct the trial court to determine whether the State abolished the split class system on September 12 or September 19, 1993. We affirm the trial court's judgment in all other respects.

Affirmed in part, reversed in part, and remanded with instructions.

BAKER, C.J., and BARNES, J., concur.